**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**Civil Division**

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC

| | |
|---|---|
| AMOS N. JONES<br>1150 K Street NW<br>Washington, D.C. 20005-6809<br><br>Plaintiff,<br><br>v.<br><br>OGLETREE, DEAKINS, NASH,<br>SMOAK & STEWART, P.C.<br>1909 K Street NW<br>Suite 1000<br><br><br><br><br><br>Defendant. | Case: 1:23-cv-03488      JURY DEMAND<br>Assigned To : Cobb, Jia M.<br>Assign. Date : 11/17/2023<br>Description: Pro se Gen. Civ. (L-Deck)<br><br>For (i) Violations of 42 U.S.C. Section 1985;<br>(ii) Tortious Interference with Prospective<br>Economic Gain; (iii) Fraud;<br>(iv) Tortious Interference with Contract;<br>(v) Intentional Infliction of Emotional<br>Distress, (vi) Bias-Related Conspiracy,<br>Theft, Conversion of Private Property, and<br>Extortion (violating D.C. Code Section<br>22-3701 *et seq*) |

*Serve:*
Registered Agent Name & Address
C T CORPORATION SYSTEM
C/O C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

## COMPLAINT FOR
## INJUNCTIVE AND MONETARY RELIEF AND JURY DEMAND

### Introductory Summary of Facts

1.    This Action is brought to remedy the documented, illegal misconduct of Defendant

Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins"), spanning eleven months,

beginning September 1, 2020, and whose effects continued even since the July 2021 period in

which – upon information and belief – Defendant investigated and dismissed one or more of the

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| AMOS N. JONES | )<br>)<br>)<br>) |
| _____<br>_Plaintiff(s)_ | )<br>) |
| v. | )   Civil Action No. |
| OGLETREE, DEAKINS, NASH,<br>SMOAK & STEWART, P.C. | )<br>)<br>) |
| _____<br>_Defendant(s)_ | )<br>)<br>) |

### SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street, N.W., Suite 1000
Washington D.C. 20006

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Amos N. Jones, Plaintiff
1150 K ST NW, 9th Floor
Washington, D.C. 20005-6809

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_ANGELA D. CAESAR, CLERK OF COURT_

Date: _____          _____
_Signature of Clerk or Deputy Clerk_

employees who violated federal and District law inside the District of Columbia as set out *infra* **because** one or more of them were guilty of violations here alleged.

2.    Defendant's conduct has been designed, orchestrated, and carried out to violate the civil rights of Plaintiff Amos N. Jones, an African-American resident of the District of Columbia, by, among other actions within the District of Columbia:

a.   interfering with, abusing, and harassing Plaintiff amidst his medical treatments by stalking his longtime primary-care-physician in Washington, D.C. – a Latino Jewish immigrant who also is a professor at the George Washington University Medical School – to the point where Plaintiff remains, to this day, indefinitely unable to obtain pre-operative care from his primary-care physician for a surgeon's clearance to remove harmful polyps in an emergency surgery on Plaintiff that had been scheduled for February 3, 2021;

b.   engaging in a continuous conspiracy within the District of Columbia – over the written warnings and citations to applicable law by renowned counsel for Plaintiff – to violate Plaintiff's civil rights under the federal Civil Rights Act of 1871 ("the Ku Klux Klan Act") and the D.C. Bias-Related Crime Act of 1989, D.C. Code §§ 22-3701(1)-(2) and 22–3704, which civil conspiracy includes not fewer than three express written threats against Plaintiff, who is an African-American man, designed to harm Plaintiff's health for the advancement of Defendant's interests; and

c.   interfering with Plaintiff's access to an urgently needed surgery for which Plaintiff's longtime Primary-care D.C. physician, a Brazilian Jewish internist and professor at George Washington University – amid a sustained terroristic attack on the medical practice in order to harm Plaintiff's health carried out over the months of November 2020 by five exponents of Defendant that included:

- illegal telephone calls,

- unlawful subpoena servicing,

- verbal threats of incarceration,

- overt attempts to disrupt a downtown D.C. medical practice,

- blatant efforts to coerce untrue testimony from the doctor and/or his staff that Defendants themselves wrote, and, by the end of November 2020,

- bizarre serving of notices of deposition in a case for which a Sept. 30-2020-filed Rule 41(a) voluntary dismissal was GRANTED (thereby noticing depositions in a case that was functionally dead) – to the point where Dr. Schapiro telephoned Plaintiff, broke down in tears, and, as per the voice-mail message captured that morning, declared the distress placed upon himself personally affecting the patient-doctor relationship as Plaintiff prepared for diagnostics toward surgery for what was found to have been polyps near the brain, lamented as follows:



[Ful, real-time voicemail audio recording on file with Plaintiff.]

3. Defendant's actions continued for months, and eventually caused the hospitalization of Plaintiff in March 2021. Rushed to George Washington University Hospital at 2 a.m. on a Saturday, deprived of medical care due to the destruction effected intentionally by Defendant, Plaintiff was examined over 12 hours, found to be seriously injured and ill, and warned by a cardiologist that were he to leave the hospital, he could die immediately; and Plaintiff – who had been in far better health in September 2020 (only battling, but making progress in physical therapy to resolve serious piriformis syndrome) soon after was declared disabled (also in March 2021), facts of which Defendant was on notice when they nevertheless dispatched their agents Richard A. Simpson and Margaret T. Kachmer of Wiley Rein  LLP in D.C. to further threaten Plaintiff in a letter to Plaintiff's counsel Tyler King, in D.C. King responded by exposing the misconduct of Wiley Rein in trying to rehabilitate Ogletree Deakins.

a. Upon information and belief, Wiley Rein knew Defendant was under investigation for Defendant's D.C. conduct carried out against Plaintiff through destroying his access to medical care by knowingly transgressing the D.C. laws quoted to three of The Ogletree Deakins Five by Plaintiff's counsel – pre-operative medical diagnostics and care for which plaintiff remains **underlined untreated** *to this present day, November 16, 2023, as Plaintiff is living without the necessary surgery from 2020, and having been rescued only weeks ago by firemen after a 4 a.m. calamity in his home caused by injuries sustained because of the Defendants' conduct against his pre-operative medical access set out* **infra**. Dr. Schapiro gave up on November 17, 2020, his voice mail resolution reveals – but Defendants pressed on with the violations of D.C. and federal law, furthering their civil rights conspiracy years in the making, and which resumed in March 2021

with the help of Wiley Rein. **Exhibit A**[1] exposes the expansion of Defendant's conspiracy as of April 13, 2021. **Exhibit B** demonstrates, in an international news report published on Aug. 2, 2021, in the widely read *Your Black World* news outlet under the headline "THREE ATTORNEYS NAMED IN D.C. KKK LAWSUIT EXIT CASE AFTER BLACK LAWYER-PLAINTIFF ALLEGED TRAIL OF MISCONDUCT," the eventual response of Defendant suggests significant investigation and knowledge of the harm-causing conspiracy against Plaintiff despite the attempt by Wiley Rein LLP to further abuse Plaintiff to abet its client, Defendant Ogletree Deakins.

4. Defendant had begun revealing its conspiracy in a series of surprise written communications in August and September 2020 in which Defendant, a law firm, expressly demanded $125,000 coverage for themselves, at Plaintiff's expense, for Defendant-specified partners and associates of Defendant in a separate dispute with a non-party to this Action opposed to Plaintiff that dated to January 2017: Thomas Farr, Michael Murphy, Regina Calabro, Alyssa Riggins, and Connie Ng (hereafter "The Ogletree Deakins Five") – after Defendants in May and June of 2017 destroyed the agreed-upon settlement term between Defendant's all-white-law-faculty client Campbell University and Plaintiff Jones of between $175,000 and $575,000 when Thomas Farr – a member of North Carolina's Jesse Helms-deployed "white-supremacist machine," according to one *New York Times* article published in 2017 – demanded that then-counsel to Plaintiff Jones, Jewish Debra Katz of Washington, D.C., drag Jones into Farr's lily-white Raleigh law office, and nowhere else,

---

[1] The contents of all Exhibits are incorporated herein by reference as if expressly stated withing the Facts. The court may note that this lawsuit is similar to a lawsuit filed in February 2021, amidst the calamity for which relief is now sought, as Plaintiff's counsel had to pull that lawsuit, withdrawing the complaint pre-service because Plaintiff's medical woes were so serious and the abuse of Defendant so relentless that damages were compounding over Spring 2021 and Plaintiff was in no physical condition to prosecute this case while being given a death warning by the GW Medical Center cardiologist in March 2021, during the hospitalization caused by Defendant's interference with Plaintiff's medical care from November 2021 onward.

to sign settlement papers. The settlement never was consummated because Farr refused to relocate the meeting to a less-segregated office (e.g., Campbell University's law campus, as suggested by Plaintiff). Defendant had their own interests in setting out to neutralize and harm Jones so that he would stop prosecuting civil-rights cases against their large, discrimination-defense law firm's global clientele.

3.    The Ogletree Deakins Five thereby separated Defendant Ogletree Deakins into a new and distinct party with its own interests operating in its own behalf against its own adversary: **Plaintiff** – as set out in Defendant's own letters and other writings that began coming forth since August 2020 that are summarized *infra*.

4.    In fact, Defendant itself exposed that conspiracy's objectives when, over the nine weeks after being officially sanctioned in a court order on September 24, 2020, and after Plaintiff had moved on September 30, 2020, to voluntarily dismiss that case, Defendant, angry and desperate after its professional misconduct in that 2017 matter had been exposed in August and September 2020, caused Plaintiff increased medical harm by knowingly interfering with and obstructing his access to crucial medical care, including by intimidating his primary-care physician to the point, in November 2020, of the physician's making numerous frightened telephone calls to Plaintiff expressing anxiety over Defendant's threats, even after Plaintiff's counsel had sent two formal warning letters to Defendant citing controlling District of Columbia law and policy protecting the patient-physician relationship, on November 12 and November 15, 2020.

5.    Defendant carried out its conspiracy and effected medical harm and other injuries upon Plaintiff in painstaking, calculating manner by, among other methods, harassing plaintiff's primary-care physician over the course of the testing and diagnostics and in the lead-up to Plaintiff's surgery, destroying Plaintiff's ability to obtain pre-operative clearance from the

primary-care physician via Defendant's series of harassing telephone calls made by Riggins and Calabro reinforcing improper subpoenas signed by Ng in order to punish Plaintiff for refusing to absolve Murphy, Farr, and the rest of The Ogletree Deakins Five for their malfeasance and awful public conduct in civil rights concerns going back years, as well as in the illegal and entirely self-serving interloping into Plaintiff's economic gain from his former employer.

6. As shown in **Exhibit C**, attached hereto (the "Ogletree Admission Letter"), Defendant had written to Plaintiff on November 13, 2020 – with no Protective Order ruling in force despite both parties' motions pending for same since September 2020 **and** with a voluntary dismissal of Plaintiff's case pending since September 30, 2020 – and admitted the following, six weeks after Plaintiff had moved for voluntary dismissal of his case citing medical conditions:

> We were forced by Mr. Jones to subpoena those records from Dr. Shapiro because of Mr. Jones's refusal to voluntarily produce them. We have served two subpoenas on Dr. Shapiro and still do not have Mr. Jones's records.

> The purpose of Ms. Riggins' phone call was to determine why Dr. Shapiro's office had not complied with these subpoenas. We called Dr. Shapiro's office hoping that his compliance with our subpoenas could be resolved without our firm having to file motions to enforce them, thereby subjecting Dr. Shapiro to a claim for our attorney's fees and costs.

> I participated in the phone call with Dr. Schapiro's office. Ms. Riggins asked an employee why Dr. Shapiro had not responded to the subpoenas. This employee voluntarily gave a reason why no response had been initially forthcoming, but stated that the records had since been mailed to our office in Washington D.C. Because we had not received the records, Ms. Riggins merely asked the employee to confirm in writing what she voluntarily told Ms. Riggins.

> We have still not received Mr. Jones's medical records. We will move forward to enforce our subpoenas against Dr. Shapiro if we do not receive them by Monday. We will seek fees and expenses against Dr. Shapiro if we are forced to take this action. You will receive notice of any motion we are required to file.

7. In one voice mail to Plaintiff, the physician's receptionist declared of the harassing communications from Calabro, Riggins, and Ng – which were abusing the entire office staff,

7

according to her, by, among other affronts, demanding that the physician and staff appear for a deposition within hours of the improper notices – that Defendant had gone "cuckoo," an apparent reference to Defendant's naked violations of the criminal statute D.C. Code § 22-1314.02 (Washington's interference-with-access-to-a-medical facility act).

8.   In fact, **the *wife-receptionist*** of Plaintiff's primary-care physician left a voice mail message for Plaintiff on November 14, 2020, at 10:14 a.m. in which she warned Plaintiff of Ms. Calabro: "It looks like this lady is totally cuckoo. She sent me, again, the request (subpoena), via Federal Express, that she's requesting, again, the records. And we sent all the records already, so she might have, you know, bipolar, or some type of problem. I don't know. Call me later."

9.   D.C. Code § 22-1314.02 makes it "unlawful for a person, except as otherwise authorized by District or federal law, alone or in concert with others, to willfully or recklessly interfere with access to or from a medical facility or to willfully or recklessly disrupt the normal functioning of such facility by:  […] (4) *Telephoning the facility repeatedly to harass or threaten owners, agents, patients, and employees, or knowingly permitting any telephone under his or her control to be so used for the purpose of threatening owners, agents, patients, and employees*[.]" [Emphases supplied.]

10.   In a formal letter to Defendant dated Friday November 12, 2020, Plaintiff, through counsel, had written to stop Defendant's illegal abuse under the subject line "The attempt by Alyssa Riggins, Esq. to manufacture false and misleading evidence by demanding that the Offices of Dr. Horacio Schapiro in Washington, D.C., construct" misinformation.

11.   Defendant wrote back and insisted they were entitled to harass the physician, which they did yet again within three days as detailed *infra*.

12. As set out in the Facts section below, Defendant has expressly refused to remedy its violations of statutory law in the District of Columbia and of the Rules of Professional Conduct applicable to the actions of The Ogletree Deakins Five, while the medical trauma to Plaintiff and the obstructed access to pre-operative care from his primary-care physician continues to forestall his ability to be operated on and to recover medically. Moreover, as recently as January 2023, Defendant refused to deny that its law firm is replete with white-supremacist interests and lawyer who are or were in the Ku Klux Klan, the White Citizens' Council, or any other such organization designed to terrorize, eliminate, and/or murder African-Americans who exercise their civil rights and advise other African-Americans in fighting for their constitutional rights. Specifically, on Friday January 27, 2023, at 11:58 a.m., Plaintiff wrote to all of Defendant's partners Robert Sar, Kevin Joyner, and Jefferson Whisenant (all white) were asked, in relevant part:

> Dear Mr. Sar, Mr. Joyner, and Mr. Whisenant:
>
> [... I]s it your law firm's position/testimony that none of the partners of your Firm who were named partners of the firm and/or any of its predecessor/constituent firms since the year 1983 has ever held membership in any of (1) the Council of Conservative Citizens, (2) the White Citizens' Council, and/or (3) the Ku Klux Klan?

To date, Defendant remains unable and/or unwilling to declaim the white-supremacist conspirators within its ranks. They did respond to a white lawyer who was representing Plaintiff elsewhere, writing to him in early March, refusing to acknowledge the existence of a Black counsel of record (Plaintiff).

On March 3, 2023, Plaintiff supplied Defendants another opportunity to deny and disprove their civil-rights conspiracy commitments, replying:

> Can you please explain why you have failed to address my previous question written to you about Ku Klux Klan membership held by attorneys and former attorneys of your law firm, and why you appear to address only white attorneys in relation to this case? [...]  What did he have to do with how Nichad Davis got torpedoed after summering in your white law office?

9

> [...] Will you, Kevin Joyner, Bradley Creed, or Rich Leonard call into the program
> at 7 p.m. until 8 p.m. on WBGR to answer for your filings and actions in this case,
> including the KKK Act lawsuit in D.C. that reveals what your law firm does these
> days?"

Again, Defendant remains unwilling and/or unable to deny its civil-rights conspiracy

commitments.

13.  Now, therefore, this Action seeks injunctive relief under Section 1985 of the Civil Rights

Act of 1871, 42 U.S.C. § 1985(2)-(3), in respect of settled public policy in the District to Columbia

protecting the physician-patient relationship as per D.C. Code § 22-1314.02 (the D.C. interference-

with-access-to-a-medical facility act) and the federal Health Insurance Portability and

Accountability Act of 1996, Pub. L. 104–191, 110 Stat. 1936 (HIPAA). Further, the action seeks

injunctive and monetary relief and remedies for Defendant's fraud/false pretenses, intentional

infliction of emotional distress, tortious interference with prospective economic gain under District

of Columbia common law and under the D.C. Biases-Related Crime Act of 1989, along with any

and all other equitable relief this Court deems proper.

14.  Consequently, an action for Defendant's violation of the laws now follows.

**PART I. PARTIES**

15.  Plaintiff is a civil rights advocate, attorney, and ordained Baptist deacon resident in

Washington, D.C., with Christian ministry credentials conferred in 2019. From a family of

historically distinguished African-American Baptist ministers in the Eastern United States dating

to 1873, Plaintiff, 43 years old, is a 2006 graduate of the Harvard Law School and formerly a

unanimously-promoted Associate Professor of Law at Campbell University Law School.

16.  Both through his law practice and as a member and/or chairman of the boards of numerous

organizations in the District of Columbia and on the East and West Coasts of the United States,

Plaintiff advocates widely for corrective measures and systemic reforms to extend Constitutional rights and freedoms to African-American citizens.  Since 2019, he has served as Co-Convener of the District of Columbia chapter of the National Conference of Black Lawyers.

17.  Plaintiff is a Top 100 Lawyers-ranked, thrice-Super Lawyers-rated American who practiced with Bryan Cave Leighton Paisner LLP in Washington, D.C., for three years until 2010 before joining the legal academy in North Carolina for seven years.  In 2006-07, he was a Fulbright/Visiting Scholar at the University of Melbourne, in Australia, and in Fall 2015 was Academic Visitor to the Faculty of Law at the University of Oxford, in England.

18.  In May 2019, the publishers of *Who's Who in America* honored Plaintiff with the Albert M. Marquis Lifetime Achievement Award for his indefatigable service in law.  Plaintiff's experience includes contracts (particularly in employment), constitutional law (particularly freedom of religion), invidious discrimination, the Foreign Agents Registration Act of 1938, and political forecasting.

19.  Widely published in legal periodicals and newspapers, Plaintiff is cited by the late Charles J. Ogletree, Jr., in The Presumption of Guilt: The Arrest of Henry Louis Gates, Jr. and Race, Class and Crime in America (2012) and by Alan Dershowitz in Preemption: A Knife that Cuts Both Ways (2006).

20.  A respected appellate attorney, Plaintiff has won key contracts disputes in employment litigation before major courts of appeals, including at the Kentucky Supreme Court (in a 7-0 reversal of lower courts in 2014 in a contracts case involving a constitutional defense of first impression) and the U.S. Court of Appeals for the Third Circuit (in a consolidated 3-0 reversal of two lower tribunals in a 2016 employment case clarifying ADR contracts' limitations).

21. A former journalist for several Pulitzer Prize-winning newspapers in the eastern United States holding a Bachelor of Arts *cum laude* from Emory University and a Master of Science from Columbia University's Graduate School of Journalism, Plaintiff played viola professionally in North Carolina's Charlotte Philharmonic Orchestra in 2000-01 after two seasons as Principal Viola in the Emory University Symphony Orchestra.

22. Defendant is an international law firm whose clients have opposed four of Plaintiff's legal clients in recent years, including in a case settled in January 2021 before the U.S. District Court for the Eastern District of Virginia in Alexandria and in a matter now pending before the Florida Human Rights Commission and U.S. Equal Employment Opportunity Commission. Defendant at all times maintained control over its employees The Ogletree Deakins Five and was responsible for their actions.

## PART II. JURISDICTION AND VENUE

23. This Court has original jurisdiction over Plaintiff's claims for violation of 42 U.S.C. § 1985 under 28 U.S.C. § 1331 as these claims arise under the laws of the United States. Plaintiff Jones has resided in the District of Columbia for years.

24. This Court has supplemental jurisdiction over Plaintiff's false pretenses, common-law fraud, and intentional infliction of emotional distress claims under 28 U.S.C. § 1367, as they form part of the same case or controversy as Plaintiff's claims for violation of 42 U.S.C. § 1985.

25. Venue is proper as the controversy involves conduct that primarily occurred, and damages-proving evidence that arose and remains almost entirely, in Washington, D.C., and the key witnesses purposefully availed themselves of the laws of Washington, D.C., by continuously operating in this jurisdiction and maintaining an office here where two of The

Ogletree Deakins Five principally practice and from which they performed allegations as set out in this Complaint offending a physician located four blocks from their office and the Plaintiff residing nine blocks down the street from Defendant's office on the same street.

### PART III: FULL STATEMENT OF FACTS

26.  Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

27.  In December 2017, Plaintiff filed suit for breach of contract and employment discrimination against several corporate and individual clients of Defendant Ogletree Deakins alleging twelve counts against, among others, Campbell University, Plaintiff's longtime employer.

28.  Since January 2018, Defendant has deployed a team of interstate attorneys that eventually grew to The Ogletree Deakins Five, ostensibly to oppose Plaintiff's civil-rights challenges to the whites-only tenure pattern at his former Campbell Law School, whom The Ogletree Deakins Five have been representing in various teams since February 2017, including at the time Plaintiff moved on September 30, 2020, to voluntarily dismiss that case.

29.  Of The Ogletree Deakins Five, Murphy and Ng practice from the global firm's Washington, D.C., office (on K Street NW) while Farr, Calabro, and Riggins practice from the Raleigh, N.C., office (on Six Forks Road).

30.  In September 2020, Defendant law firm – facing sanctions for failure to produce two named parties and an insurance official during an all-day, court-ordered Mediation Settlement Conference held over nine hours on Juneteenth (i.e., June 19, 2020) in the Raleigh offices of Defendant in the case Plaintiff later moved to voluntarily dismiss – announced **Defendant Ogletree Deakins's *own personal corporate dispute with Professor Jones*** distinct from that which they were then settling on behalf of their client, Campbell University.

31.   This revelation came as Jones was resolving his four-year-old battle against Defendant's client, his former employer (Campbell University), having reached agreement on nearly all of the material terms to restore some economic benefit to Plaintiff before Defendant insisted on this surprise positioning of The Ogletree Deakins Five as putative defendants.

32.   Defendant's $125,000 demand confirms its conspiratorial intent. On Sept. 1, 2020, in a letter over Thomas A. Farr's signature, Defendant Ogletree Deakins at Pages 1-2 wrote to Plaintiff, for the first time revealing Defendant's concealment of its personal corporate interest in the matter to be dismissed:

> "However, this is not merely the settlement of a lawsuit and Campbell will not agree to that verbiage. Campbell is not going to pay Mr. Jones any money unless any and all possible disputes between him and Campbell and its employees and agents are resolved.
>
> "The release will need to include Campbell's agents as being released.
>
> "In paragraph (2)(a), Campbell will not delete references to Ogletree […]"
>
> "We had hoped that we would reach an agreement so that both sides could stop spending attorney's fees. Given your recent letter […] it appears to us that even if we reach an understanding in principle, it could take weeks or months to negotiate the details of a release agreement."

33.   As stated *supra*, The Ogletree Deakins Five thereby separated Defendant Ogletree Deakins into a new and distinct party, revealing that it was pursuing its own interests, operating in its own behalf, against its newly declared adversary, Plaintiff, with what would protract over the next twelve weeks, post-dismissal motion, into a continual reach into, with deleterious conduct carried out inside, the District of Columbia.

34.   As can be readily inferred from the "Ogletree Admission Letter" to this Complaint (Exhibit C), discussed *infra*, that attorney misconduct by The Ogletree Deakins Five required immediate attention and raised an entirely new dispute that had been concealed from Plaintiff over the years that they had been in their clients' case.  Thomas Farr, for example, was the first of Defendant's

employees to appear, and he did so on February 14, 2017, to represent Campbell University at the beginning of the federal investigation of Farr's client's alleged illegal employment discrimination; however, never in any Rule 12(f) disclosure or anywhere else did Farr ever reveal until late 2020 that Defendant Ogletree Deakins had its own dispute with Plaintiff that it was hoping Plaintiff would "release" Defendant from.

35.   Upon learning of the personal corporate issues presented by The Ogletree Deakins Five on September 1, 2020, Plaintiff sought to empower Defendant to correct course voluntarily by exchanging written notice communications; however, Defendant refused and in response to Plaintiff's exposing Defendant's professional misconduct of interfering with Plaintiff's settlement, Defendant issued repeated written threats, three times over the weeks from mid-August 2020 into much of September.

36.   Plaintiff moved to voluntarily dismiss his three-year-old Campbell University action under Fed. R. Civ. Pro. Rule 41, citing documented medical challenges **and**, in a reply brief, calling attention to the surprising necessity of immediately finding and retaining counsel to challenge the conduct of The Ogletree Deakins Five and to negotiate with **them**, given that they had inserted themselves and Defendant's personal corporate issues with Plaintiff as putative Defendants seeking Jones's silence about their conduct over the years.

37.   As stated *infra*, in the then-44 months over which Plaintiff's dispute with Campbell University had transpired, none of either Defendant or The Ogletree Deakins Five had disclosed their personal corporate interests in entering into an agreement with their competitor in business, national civil-rights attorney Amos N. Jones, whose law firm is himself (a D.C. sole proprietorship) – even after Defendant had procured extremely sensitive business information from Plaintiff during Discovery including a cache of confidential information marked as such from

Bryan Cave Leighton Paisner LLP about Plaintiff's outstanding work and reviews for his high-profile clientele there *in the absence of a protective order* in Defendant's Campbell case. *See* Exhibit D attached hereto (Bryan Cave Leighton Paisner LLP's May 28, 2020, objections served upon Defendant).

38. Delineating Defendant's revelations and Plaintiff's attempts to stop the civil-rights conspiracy is the October 22, 2020, "Plaintiff's Response to Defendants' Memorandum in Opposition to Plaintiff's Motion to Dismiss," a true and correct copy of which is attached to this Complaint as Exhibit E and, for pleading purposes, completely incorporated as if stated herein. This pleading further exposed the dishonesty of Defendant as part of a program to deploy new attacks on Plaintiff and his doctor's office amid the medical calamities Plaintiff was suffering.[2]

***The Recent History of The Ogletree Deakins Five's Ringleader, Thomas Farr, Targeting Innocent African-Americans***

---

[2] For example, Exhibit E states what Defendant did **three weeks <u>AFTER</u> *Plaintiff moved to dismiss his case against Defendant's clients***: "Pages 6 through 9 depict how Ogletree Deakins attorneys have sought to turn this case into a mule by which they can extract information about Professor Jones's law firm (including, for example: (a) the Ogletree attorneys' attempt to gain access to his client list and other proprietary information from Bryan Cave Leighton Paisner, LLP, which Ogletree Putative Defendants did by subpoena, (b) the Ogletree attorneys' quest to learn about other financial matters inside Plaintiff's law firm, which Defendants have sought in a lately-filed Motion to Compel Discovery over his written objections to the disclosures, and (c) the Ogletree attorneys' attempt to forestall Professor Jones's adversarial posture with regard to current or future cases in his national employment-discrimination practice where Ogletree Deakins is on the defense, as in a long-running federal lawsuit now pending in the U.S. District Court for the Eastern District of Virginia in which Jones is lead Plaintiff's counsel and Ogletree Deakins is on the defense, *Tyrone D. Best v. Paragon Systems, Inc.*, Civil Action 1:20-cv-00927 (previously 1:19-cv-00608- LO- TCB)). To be sure, *on September 29, the Defense counsel nakedly seek 'bills for any attorney work performed by Plaintiff,'* **Exhibit H.**, p. 3 [emphases added]. And these actions are to say nothing of Ogletree Putative Defendant Farr's personal axe to grind against the kind of civil-rights activity Professor Jones champions on behalf of African-Americans nationally (*see, e.g.,* D.E. 114- 11 (published histories of Ogletree Putative Defendant Farr's practice of assaulting African- American's civil rights spanning four decades)). The September 14 Notice letter sought to rehabilitate the Parties' settlement agreement and get it back on track, adhering to the Rules of Professional Conduct binding all attorney-parties." [Emphases in original.]

39. The history of legally sanctioned harassment of African-Americans is long and well-documented in the United States of America, from the Ku Klux Klan's founding, reportedly in a Tennessee law office, to Rosa Parks's having been indicted in Alabama after her success in championing the seminal Montgomery Bus Boycott, to later-disbarred Attorney Roy Cohn's defamation lawsuit against the Rev. Dr. Martin Luther King, Jr., and others that resulted in the Supreme Court's famous First Amendment decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

40. Under a platform of philosophized white racial superiority, the Ku Klux Klan employed violence as a means of reversing Reconstruction and its enfranchisement of African-Americans.

41. According to The History Channel's December 24, 1865, "This Day in History" program available at https://www.history.com/this-day-in-history/kkk-founded, "Most prominent in counties where the races were relatively equal in number, the KKK engaged in terrorist raids against African Americans and white Republicans at night, employing intimidation, destruction of property, assault, and murder to achieve its aims and influence upcoming elections."

42. The Civil Rights Act of 1871 was passed to illegalize such conspiracies by the Ku Klux Klan *and any others* acting in concert against African-Americans' civil rights, from Jim Crow to "James Crow, Jr., Esquire." *See* Derek T. Dingle, "March On Washington at 50: We Must Ring The Bell Of Economic Freedom," Black Enterprise, Nov. 15, 2017 (explaining "James Crow, Jr., Esquire" as the front of contemporary terrorism against African-Americans carried out by anti-African-American lawyers).

43. In January 2020, Tennessee governor Bill Lee introduced legislation to amend a law that had required the state to honor Nathan Bedford Forrest, a Confederate general who went on to lead

the Ku Klux Klan, showing the long and unbroken reach of slavery sympathizers into the year

2020.

44. Today, Defendant's longtime Partner Thomas Farr, 66, leads the Ogletree Deakins Five in

Defendant's illegal activity against civil rights scholar-advocate Amos Jones.

45. According to an authoritative December 26, 2017, op-ed report published *The New York*

*Times* and available at https://www.nytimes.com/2017/12/26/opinion/william-barber-trumps-

judge-farr.html, Mr. Farr brings a long and sordid recent history of intimidating African-

Americans by dishonest means:

    a. Among President Trump's worrisome nominees to the judiciary, perhaps none is as alarming as Thomas Alvin Farr, a protégé of Jesse Helms, the former North Carolina senator, and a product of the modern white supremacist machine that Mr. Helms pioneered.

    b. Mr. Farr, nominated to serve on the United States District Court for the Eastern District of North Carolina, began his career as counsel for Mr. Helms's Senate campaigns, where he participated in racist tactics to intimidate African-American voters. This alone is reason to reject his nomination, as is his apparent lying on the topic to the Senate Judiciary Committee. But Mr. Farr's connections to Mr. Helms's white supremacist causes and political network go much deeper.

    c. [...]An unabashed segregationist, Mr. Helms was affiliated with the Council of Conservative Citizens, an outgrowth of the White Citizens' Councils that promoted white supremacy. Mr. Helms, who served in the Senate for 30 years, used his honorable seat to support the apartheid regime in South Africa while opposing desegregation, civil rights legislation and the creation of the Martin Luther King's Birthday holiday in this country. Mr. Helms also belittled Carol Moseley Braun, the only black senator at the time, by singing "Dixie" to her in the Senate elevator.

    d. Mr. Farr's former law partner, Thomas Ellis, was Mr. Helms's top deputy for decades. He also served as a director of the Nazi-inspired, pro-eugenics Pioneer Fund and used funding from that organization to create and bankroll a network of interlocking organizations to support Mr. Helms and other political candidates who espoused the notion of a superior white race and opposed civil rights.

    e. Together, Mr. Helms, Mr. Ellis, and their protégé Mr. Farr unleashed a huge propaganda machine that incited hostility toward African-Americans. Mr. Farr served as a lead counsel to Mr. Helms's 1990 Senate campaign, which ran the now-infamous "White Hands" TV television ad, designed to inflame white voter anxiety over Mr. Helms's black opponent, Harvey Gantt. [...] The same campaign also sent more than 100,000 intimidating postcards to North Carolinians, most of whom were blacks eligible to vote, wrongly suggesting they were ineligible and warning that they could be prosecuted for fraud if they tried to cast ballots.

f. Mr. Farr represented the Helms campaign in 1984, when it circulated photos of his opponent, Gov. Jim Hunt, with African-American leaders in an attempt to foster white resentment. The racist nature of that campaign was so pronounced that a federal court cited it as an example of how bigotry in elections continued to flourish in North Carolina politics.

g. A straight line runs from the racial polarization inflamed for decades by Mr. Helms and his political machine to the re-emergence of violent white supremacists in the past year in places like Charlottesville, Va.

h. When Mr. Farr graduated from law school, Mr. Helms and Mr. Ellis brought him into their fold. Mr. Farr joined the small law firm of Maupin, Taylor & Ellis, where all of the named partners were openly hostile to civil rights. Mr. Farr followed those lawyers to other firms and maintained a close collaboration with Mr. Ellis for at least 34 years. Mr. Farr disclosed on his Senate Judiciary Committee questionnaire that he spoke "in honor of" Mr. Ellis as recently as 2007. And over decades of association with Mr. Helms and Mr. Ellis, he never publicly denounced or even faintly criticized their notorious racism and belief in white superiority.

i. To the contrary, Mr. Farr worked closely with Mr. Ellis to represent Mr. Helms's agenda in court. Significantly, he represented several of the Helms entities that received large donations from the Pioneer Fund, including the Coalition for Freedom.

j. Most recently, Mr. Farr has carried on Mr. Helms's legacy by helping North Carolina's Republican-led Legislature create and defend in court discriminatory voting restrictions and electoral districts, which were eventually struck down by numerous federal courts that found them to be motivated by intentional racism. In fact, the United States Court of Appeals for the Fourth Circuit found that the state's 2013 voter suppression law was aimed at blacks with "almost surgical precision."

46. On November 29, 2018, the white-majority, male-majority, and Republican-majority United States Senate finally positioned itself to vote down Farr's nomination 51-49 after the racism charges against Farr were found to be credible and African-American Senator Corey Booker and then-Senator Kamala Harris had expressed concerns alleging that Farr had misled or lied to Congress about it and requested that he return for under-oath questioning to address newly discovered evidence. The sordid legacy of Farr's actions dating back decades was covered nationally in the press.

47. On January 3, 2019, Farr's nomination was returned to President Trump, defeated under Rule XXXI, Paragraph 6 of the United States Senate.

48. Currently, after the long period of racial unrest and civil strife over much of the historic year 2020, Defendant extols Mr. Farr on its Web site and, in Defendant's official biography marketing Mr. Farr's services, even champions Mr. Farr's defeated nomination to the federal judiciary. A true and correct copy of Defendant's promotion of Mr. Farr is attached hereto as Exhibit F.

49. Meanwhile, throughout 2017-2020, Plaintiff raised awareness in and around Washington, D.C., about the Defendant's civil-rights record, including picketing with other faith leaders after Defendant was sued in 2018 by its own white-female partner Dawn Knepper in a proposed sex-bias class action for $300 million.

50. Demonstrating on the K Street sidewalk in front of Defendant's K Street offices in August 2018, Plaintiff and others held signage including one reading, "Ogletree Deakin$, Pay Tho$e Women Partner$ Now."

51. The women's lawsuit – to which Plaintiff Jones had no connection but that compelled his action due to his firm commitment to advancing women's advancement in the legal profession – was dismissed by joint stipulation on Friday January 31, 2020.

52. That same month, Plaintiff's action against Defendant's client Campbell University continued in the Eastern District of North Carolina federal court in Raleigh, and over the next seven months, the case proceeded mostly as a normal employment-discrimination dispute between a former employee and his  former employer, although a parallel lawsuit brought against Defendant's client Campbell University by an African-American female former co-employee of Plaintiff Jones was simultaneously before the E.D.N.C. federal court and judge presiding over Plaintiff's action and Jones had represented her before the U.S. Equal Employment Opportunity Commission for nearly two years.

***Defendant Reveals Its Personal Corporate Interests in Violating Plaintiff's Civil Rights***

53.  Out of the blue and totally unexpectedly for Plaintiff in this Action, on August 27, 2020, *as soon as Plaintiff had finally reached material agreement on the major points of settlement as to **Defendant's** <u>client</u>*, Defendant law firm wrote to Plaintiff's counsel and – all of a sudden – demanded, without offering consideration, that Plaintiff accept additional terms of an agreement The Ogletree Deakins Five purportedly were drafting by which Plaintiff would be required to cease his public critiques of the public conduct and marketing of Defendant law firm or would have to pay them $125,000 per person every time he engaged in "disparagement" of Defendant law firm!

54.  As set out in Exhibit E, Plaintiff attempted to correct Defendant and allow Defendant the opportunity to abandon its illegal position in clear writings, including very long letters, explaining the professional misconduct and harm to Plaintiff's and Defendant's clients' interests. For example, Page Two of Exhibit E summarizes under Section I **"Defendants' Revelations of New Putative Defendants from Aug. 27 to Sept. 30"** (The Ogletree Deakins Five "attorneys avowedly and expressly insisted on such illegalizing of the Parties' settlement, despite the Parties' agreement on material terms – all in plain violations of N.C. Rules of Professional Conduct 1.7 (conflicts of interest between attorney and client), 5.6 (restrictions on attorneys' right to practice), 8.4 (conduct interfering with the administration of justice, as defined in a controlling ethics rule in this jurisdiction quoted *infra* as applying to conduct just like Defendants' counsel here), and 1.2 (scope of representation and allocation of authority), E.D.N.C. Local Rule 83.1, and Fed. R. Civ. P. 11 (*see* **Exhibit G**, summarized in Section IV., *infra*).") and Page Five of Exhibit E summarizes under Section II **"Defendants' Eleventh-Hour Additions of at Least Four New Putative Defendants Necessitates the Recruitment and Assembly of an Enlarged Legal Team"** ("Defendants' counsel, in writings dating to August 27, 2020, have added at least four new individuals as surprise

putative defendants in violation of the applicable Rules of Professional Conduct – and these new defendants are the named defense lawyers themselves, delaying and running up expensive legal bills over the course of five weeks spanning two months as Plaintiff tried to restore ethics and enter into the settlement their clients presented in a rehabilitated form; and (4) the self-serving named defense counsel/putative defendants withdrew their clients' and Plaintiff's settlement agreement because Plaintiff refused, over four weeks of written deliberation, to violate the rules of professional conduct by entering into the coerced and illegal agreement with the surprise defendants: Ogletree Deakins attorneys Michael Murphy, Regina Calabro, Alyssa Riggins, and Tomas Farr (and possibly Attorney Connie Ng). Defense attorneys to date have refused to defend the unethical misconduct, as shown in the exhibits to this Plaintiff's Response. After more than a month of deliberation over final terms, Defense counsel abandoned the Parties' agreement on September 29. *See id.*").

55.   Meanwhile, Defendant knew of the medical trauma throughout that period that Plaintiff suffered, as set out in Section II of Exhibit E.

56.   During the four weeks over which Defendant was trying to coerce its own settlement with Plaintiff for the benefit of The Ogletree Deakins Five, negotiations for a proper Consent Protective Order were falling apart.

57.   Also, despite the overture long before sanctions were ordered, Farr had refused Plaintiff's offer to stipulate to a stay in the case during settlement, which Plaintiff now realizes was part of his  effort to create waste and to financially abuse Plaintiff Jones by running up hours, work product, legal bills, and medical distress for Plaintiff, who is represented in the Campbell action by three counsel of record across three firms located in two states and who was under the care of three physicians including two surgeons during the ordeal known to Defendant.

58.  And then, on September 24, 2020, the E.D.N.C. federal court sanctioned Defendant under Fed. R. Civ. Pro. Rule 37(b) for Defendant's refusal to produce certain named Campbell defendants and an insurance official at the Juneteenth mediation where those persons had been ordered to appear in Farr's office.  Citing substantive violations of Rules, the judge's order entered on September 24, 2020, had been signed on September 22, 2020.

59.  On September 30, 2020, with an impasse due to the intransigence of the Putative Defendants named in Exhibit E, with medical complications mounting, and with cash resources lost due to the professional misconduct of Defendant – and with nothing but early written discovery so far having taken place in the Campbell case – Amos Jones moved to voluntarily dismiss the case under Rule 41(a), which was to offer a reprieve for him to focus on medical care after battling what he had been led to believe was only Defendant's clients over the 45 months of the employment dispute.

60.  Farr went ballistic and so Defendant went rogue as set out below.

***Post-41(a) Motion, The Ogletree Deakins Five Relentlessly Issue Subpoenas and Harass Plaintiff's Primary Care Physician over Nine More Weeks in Lead-up to Surgery***

61.  Realizing Defendant had concealed its role as an adverse party seeking personally to neutralize Plaintiff's activism, and battling documented medical challenges that would require surgery, Plaintiff, on September 30, 2020, six days after the sanctions order, moved to dismiss his action voluntarily under Federal Rule of Civil Procedure 41(a).

62.  Rather than cease and desist in order for Plaintiff to pursue intense medical treatment with his longtime doctors and surgeons in Washington, D.C., Defendant sought to harass, intimidate, and abuse Plaintiff by unlawfully threatening, intimidating, and abusing Plaintiff's primary-care physician's entire office as set out in Paragraph 6, *supra*.

63. To be sure, on October 28 – *four weeks* **after** *Plaintiff moved to dismiss his case* documenting medical problems and other concerns, Defendant, operating further to its conspiracy to harm Plaintiff, issued a lone "INTERROGATORY NO. 15:"

Identify the "medical clinic in Florida" that treated you as referenced on page 4 of D.E. 127, as well as all individuals who treated you, and the treatments you had in [sic] while at the "medical clinic."

64. Plaintiff responded to that untimely interrogatory as soon as Defendant's harassment of Plaintiff's primary-care physician came to light.  In the previously referenced formal letter to Defendant of November 12, 2020, Plaintiff, through counsel and under the subject line "The attempt by Alyssa Riggins, Esq. to manufacture false and misleading evidence by demanding that the Offices of Dr. Horacio Schapiro in Washington, D.C., construct a substantive e-mail, containing deliberate misrepresentations, in *Jones v. Campbell University, Inc., et al* (5:20-cv-29-BO)," advised, *inter alia*:

This correspondence is in response to the alarming notice we received today that (1) Alyssa Riggins, Esq. has dialed into Washington, D.C., to prevail upon the medical office of Dr. Horacio Schapiro, Professor Jones' Washington, D.C.-based physician ("Dr. Schapiro") to try to force Dr. Schapiro's office to create and distribute electronic mail conveying a claim manufactured by Ms. Riggins, and (2) Ms. Riggins has directed D.C. medical providers to send said manufactured electronic mail immediately to Ms. Riggins in order to advance Defendants' case.

Defendants have maintained an authorization-to-release form covering Plaintiff's medical records from Dr. Schapiro's office since Defendants' insurer, Sun Life, researched for Professor Jones's appeal of the denial of short-term disability benefits in the summer of 2017. Moreover, Defendants have subpoenaed all medical records. Why Ms. Riggins was on the telephone seeking to have the medical office of Dr. Schapiro generate new electronic mail in order to conjure "contemporaneous" notes that were back-dated, and why she pressured the office enough to cause staffers there to complain about her deceitful and abusive tactics, are questions to which we require answers.

[…]

24

Why did Ms. Riggins pressure Washington, D.C.-based Dr. Schapiro, to generate new e-mail dictated by Ms. Riggins and containing false and misleading information, and, then, to send that e-mail immediately to Ms. Riggins in North Carolina?

In the District of Columbia, there is a strong public policy against the kind of interloping Ms. Riggins has deployed, valuing the physician-patient relationship especially over the course of litigation like the employment dispute between Professor Jones and your clients. See, e.g., D.C. Code § 14-307 (District of Columbia law prohibiting judges from issuing a subpoena for medical records.). And then there is the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191 (HIPAA). As official guidance from the U.S. Department of Health and Human Services notes, "A subpoena issued by someone other than a judge, such as a court clerk or an attorney in a case, is different from a court order. A HIPAA-covered provider or plan may disclose information to a party issuing a subpoena only if the notification requirements of the Privacy Rule are met." See https://www.hhs.gov/hipaa/for-individuals/court-orders-subpoenas/index.html. Accord 45 C.F.R. § 164.512(e), which notes:

"Before responding to the subpoena, the provider or plan should receive evidence that there were reasonable efforts to:

- "Notify the person who is the subject of the information about the request, so the person has a chance to object to the disclosure, or
- "Seek a qualified protective order for the information from the court."

Dr. Schapiro and his team have built a wonderful, well-respected medical practice within the District of Columbia, and Dr. Schapiro's medical practice boasts some of the metropolitan-D.C. area's top professionals. We are shocked and surprised by Ms. Riggins's behavior, in particular, the intimidation tactics she deployed with Dr. Schapiro's staff.

In light of the actions of Ms. Riggins, we direct that, in any communications Ogletree Deakins (including any of its attorneys or other professional staff) has with Professor Jones's D.C. medical providers, all of which privileged relationships are protected within the District of Columbia, Ogletree Deakins is to conduct said communications in writing and to COPY Professor Jones on all such communications in real time. We remind Ms. Riggins that, to any extent she might have made herself a necessary witness, she is no longer to advocate at trial in this action as per N.C. Rule of Professional Conduct 3.7(a). We regret that she has willfully chosen to interfere with relations between Professor Jones and medical professionals serving Professor Jones in Washington, D.C., as he is trying to focus on his medical recovery.

65. Plaintiff, through counsel, thus warned Defendant of the protections afforded Plaintiff under D.C. law and of Defendant's violation of those protections.

66. Defendant responded by deploying the "Ogletree Admission Letter"

25

67.  On Friday November 13, 2020, moreover, Defendant filed a Motion to Compel Plaintiff to travel to Raleigh, North Carolina, to sit for an "independent medical examination" set up by Farr, the ascribed bigot exposed in the *New York Times* and the United States Senate for abusing African-Americans systematically through legalistic means.

68.  Meanwhile, Plaintiff withdrew his July 2020-issued medical consent after learning that Defendant subsequently called to harass his physician's office yet again.

69.  Plaintiff's primary-care physician is a Hispanic, Jewish man, and his receptionist and staff are Latinas.

70.  On November 15, 2020, by and through counsel's formal letter, Plaintiff advised Defendant, who had been seeking to go to Plaintiff's other medical specialists in order to orchestrate similar obstructions, as follows:

> Regarding Defendants' above-identified October 28, 2020, Interrogatory, Plaintiff objects to the Interrogatory as out of time per the notices by letter or e-mail to you and/or by our court filings from September into this month that informed you that no further Discovery would be tendered until a Protective Order were in place in this case, following your declaration of same—and noticed to you as soon as you noticed us of the need for judicial intervention in Discovery. Judge Boyle (and not Thomas Farr, Gina Calabro, and Alyssa Riggins) is to resolve the Discovery disputes and re-set deadlines, including the one over the protective order, where two orders are before the judge. Given the Campbell Defendants misrepresentations to the Court filed on Friday and the documented abuses of Professor Jones's physician in Washington in recent days by Ogletree Deakins attorneys, Plaintiff will not answer the Interrogatory until the Discovery dispute over the protective order is decided.
>
> As we advised you in our letters of Thursday November 12 and Friday November 13, 2020, your actions in respect of your interaction with Professor Jones's primary physician, Dr. Schapiro, actions whose affects produced consequences in Washington, D.C., are in violation of Health Insurance Portability and Accountability Act of 1996, as amended. We will not facilitate further violations on your part harmful to Professor Jones's physician-patient relationship in Florida by prematurely answering the interrogatory of October 28. We do fully intend to answer the interrogatory, but will do so under the Court supervision for which both you and we have moved.

71. For absolute certainty and in the wake of Defendant's relentless lawlessness and in the absence of a protective order, Plaintiff on November 19, 2020, revoked his July 14 authorization to release medical records previously tendered to Defendant (before The Ogletree Deakins Five had admitted their status as putative defendants in this action) by signed notice to counsel titled "PLAINTIFF'S REVOCATION OF ALL AUTHORIZATIONS TO RELEASE MEDICAL RECORDS SIGNED SINCE JANUARY 1, 2017," which was served on Defendants on Sunday November 22, 2020. *See* Exhibit G attached hereto (Plaintiff's revocation citing abusive lawlessness of Defendant).

72. The District of Columbia's patient-protection public policy and statutes are long-established and support perhaps the strongest doctor-patient privilege in the history of American law, buttressed by statutes that inform the public policy here.

73. D.C. Code § 22-1314.02 is the D.C. interference-with-access-to-a-medical facility act, and it criminalizes what Defendant in this case has done to Plaintiff through Plaintiff's primary-care physician.

74. D.C. Code § 14-307 prohibits even D.C. judges from issuing a subpoena for medical records.

75. And The Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191 (HIPAA), according to official guidance from the U.S. Department of Health and Human Services, requires: "A subpoena issued by someone other than a judge, such as a court clerk or an attorney in a case, is different from a court order. A HIPAA-covered provider or plan may disclose information to a party issuing a subpoena only if the notification requirements of the Privacy Rule are met." *See* Official Guidance at https://www.hhs.gov/hipaa/for-individuals/court-orders-subpoenas/index.html (last visited November 15, 2020). *Accord* 45 C.F.R. § 164.512(e), which

27

notes: "Before responding to the subpoena, the provider or plan should receive evidence that there were reasonable efforts to:

- **Notify the person who is the subject** of the information about the request, so the person has a chance to object to the disclosure, **or**
- **Seek a qualified protective order for the information from the court**."

[Emphasis supplied.]

76. Over the course of Defendant's medical-harassment campaign, The Ogletree Deakins Five – all of them lawyers in an international employment practice – knew or should have known both that they were violating the civil rights of Plaintiff and that they were exacerbating his documented medical peril that they had studied for months.

77. Over the course of November 2020, Plaintiff's doctor telephoned or e-mailed Plaintiff not fewer than four times distressed, having lost sleep and money over the harassment. To be sure, as stated *infra*, **the *wife*** of Plaintiff's primary-care physician left a voice mail message for Plaintiff on November 14, 2020, at 10:14 a.m. in which she warned Plaintiff of Ms. Calabro: "It looks like this lady is totally cuckoo. She sent me, again, the request (subpoena), via Federal Express, that she's requesting, again, the records. And we sent all the records already, so she might have, you know, bipolar, or some type of problem. I don't know. Call me later."

78. **Again,** D.C. Code § 22-1314.02 makes it "unlawful for a person, except as otherwise authorized by District or federal law, alone or in concert with others, to willfully or recklessly interfere with access to or from a medical facility or to willfully or recklessly disrupt the normal functioning of such facility by: […] (4) *Telephoning the facility repeatedly to harass or threaten owners, agents, patients, and employees, or knowingly permitting any telephone under his or her control to be so used for the purpose of threatening owners, agents, patients, and employees*[.]" [Emphases supplied.]

28

79. Eventually, Plaintiff's primary-care physician's own attorney appeared and intervened against Defendant to shut down yet another subpoena from Defendant in early December.

80. Meanwhile, Plaintiff experienced a medical collapse requiring immediate referral to surgery after severe polyps were found and videotaped near his brain.

81. On November 30, 2020, Plaintiff, through counsel, filed a formal Letter with the judge in which he noted having just been diagnosed and referred to surgery for "discovery of innumerable polyps and an order for immediate otolaryngological surgery," quoting the November 24 surgeon scheduler's voice message:

> Hi, Mr. Jones. My name is Trish. I'm calling from Dr. Sekhsaria's office. I'm his surgical coordinator. I wanted to see if you wanted to discuss some dates from your surgery. I will be in the office today until 5, and then I'll be back in the office on Monday morning. Dr. Sekhsaria will be sending you to Shady Grove Hospital, and he goes there on Wednesdays. So if you want to look at some Wednesdays that might be good for you, umm, if I don't hear back from you today, I will be back in the office Monday at 10, and I will call you first thing. Thank you. Bye-bye.

82. Plaintiff's counsel concluded:

> Given that Professor Jones's medical mystery of September 30 appears to be solved and the medical uncertainty of this year now eliminated, and in light of the fact that the anticipated operation and recovery time per the surgeon's advice and experience are at least four weeks plus the continued physical therapy for the Piriformis Syndrome that stopped during the COVID quarantine, Plaintiff respectfully moves the Court to STAY the proceedings and to AMEND the April 17, 2020, Scheduling Order [D.E. 66] accordingly. Thus, in lieu of the Rule 41(a)(2) voluntary dismissal that Plaintiff requested amid significant uncertainty of late September 2020 and Defendants' then-failure to produce Discovery and schedule depositions that they, since October 2014 have shown a willingness to undertake – Plaintiff today moves for **STAYING THE CASE FOR SIX MONTHS AND ADJUSTING THE SCHEDULING ORDER ACCORDINGLY.**

[Emphases in original.]

83. The judge granted the motion to stay – but not before Plaintiff had to issue yet another pleading to quash Defendant's duplicative, harassing "Amended" subpoenas on his primary-care physician's office.

84. Plaintiff has remained unable to seek pre-operative treatment with his primary-care physician due to the conflicting of his primary-care physician in providing privileged pre-operative counseling to Plaintiff – conflicting that resulted entirely from Defendant's repeated threats against the physician's medical practice and staff and due to Plaintiff's having to have another surgery on February 2 due to the reappearance of lesions that appeared elsewhere on his body during the ordeal of Defendant's harassment campaign over October, November, and December – after Plaintiff had moved to dismiss his own case in September citing medical concerns, in which his counsel in the September 30, 2020, Rule 41(a)(2) motion had advised:

> Washington, D.C., remains under emergency pandemic orders due to the severe incidents of Covid-19 in the District. Despite taking safety precautions, after reporting on the site visit on Sunday, by Monday September 28, Professor Jones had developed Coronavirus-like symptoms and was directed by physical therapists at Evidence Physical Therapy to immediately cancel all of the next six weeks of treatment sessions for the recent-onset Piriformis Syndrome about which this Court is familiar (*see* D.E. 109 at 15-16) and directed him to a 14-day self-quarantine. On Tuesday September 29, as Plaintiff had lost his smell and taste senses, his primary-care-physician's office advised him as to Covid-19 testing resources, directing him to continue in quarantine. On Wednesday September 30, Plaintiff suffered from fever and developed a cough. Meanwhile, his Piriformis Syndrome, which had worsened to the point of requiring nearly twice as many sessions for which therapists scheduled him through October, is now left untreated, causing mobility impairment and nerve-related pain. As a result of his impending medical treatments and isolation that are both intensive and intense, and the requirement at least to quarantine for 14 days pending observation and diagnosis, Professor Jones is unable and/or will be incapacitated to address this lawsuit for the time being.

***Defendant's Simultaneous and Continuous Harassment and Publicizing of Plaintiff's Location at D.C.'s Historic Asbury United Methodist Church Precedes Church Arson by The Proud Boys' National Leader***

85.  In late October, during the heated last days of the election of 2020, Plaintiff – who engages publicly through Washington, D.C.'s "Direct Action Ministries: A Baptist Fellowship" – produced a public service video overlooking the Asbury United Methodist Church on K Street in Washington, D.C., and marked as being from that location as posted on YouTube on October 23, 2020.

86.  In this public-service film recorded on October 22, 2020, Plaintiff – supported by a brace due to his medical calamity – warned the public of the Defendant's role in racial and gender strife, especially Farr's and Calabro's; Farr and Calabro had in early 2020 defended a white woman's referring to an African-American infant as a monkey for years, causing Wake Forest University Law School Associate Dean Dr. Gregory Parks to issue an expert report exposing the civil-rights violations upheld by Defendant and, evidently, acquiesced to by North Carolina Secretary of State Elaine Marshall, who was facing re-election. Plaintiff also discussed the sex-bias $300 million lawsuit against Defendant.

87.  That day, Defendant – 23 days after Plaintiff had moved to dismiss his case, scheduled a "Conjured Deposition" of Plaintiff in North Carolina – conjured in that it was scheduled *unilaterally by Defendant* <u>on October 22</u> *by Defendants for* **November 10, 2020** – *after* a judge in Washington, D.C., **ON OCTOBER 21, 2020,** *already had ordered* Plaintiff to appear at a mediation settlement conference in a separate and collateral proceeding via Microsoft Teams in Washington, D.C., **at the same time, 10 a.m. on November 10, 2020**, where Plaintiff was to represent a federal employee in an ongoing action. This dual scheduling had the effect of creating anxiety and expense for Plaintiff, in furtherance of Defendant's need to eliminate Plaintiff to advantage the business and practices of The Ogletree Deakins Five.

88.  The next day, Defendant law firm immediately publicized the film and the Web site of Direct Action Ministries, including photographing the video that lists the Asbury United Methodist Church as the location and warning the court of "new evidence," demonstrating their personal axe to grind against Plaintiff as they had revealed when Defendant terminated its clients' settlement finalization with Plaintiff; this video was evidence of nothing relevant to their clients' issues, but it was probative of The Ogletree Deakins Five's desire to force Plaintiff to pay *them* $125,000 under a settlement agreement with which they had illegally surprised him in August and September 2020.

89.  As summarized in the *New York Times* article quoted *infra*, Defendant partner Thomas Farr was denied a federal judicial appointment in a Senate vote against Farr in 2018 after compelling and disturbing evidence emerged that his intimidation and harassment of African-Americans went back at least 30 years and was pervasive.

90.  The *New York Times* article situated Defendant's Farr within a network of white-supremacist organizations organized since the end of the Civil War to destroy African-American homes, families, institutions, and civil rights figures.

91.  The Asbury United Methodist Church is a historic African-American church that has stood against racial discrimination since its founding in 1836. The congregation has worshiped on the same site, at 11th and K streets in Northwest, since its 1836 inception.

92.  This is the site where Plaintiff was located in the October 22, 2020, Direct Action Ministries film and that Farr publicized immediately thereafter.

93.  Days later, late on the evening of Saturday December 12, 2020, in a premediated descent upon majority-minority Washington, D.C., a white-male mob angered by the federal election results descended upon Asbury United Methodist Church where Plaintiff had filmed his ministry

announcement. At approximately 11 p.m. that night, the gangsters trespassed the church, tore down its longstanding Black Lives Matter banner that had been posted on Facebook by Plaintiff in June 2020 during the height of the George Floyd demonstrations, dragged the congregation's banner into the streets of Downtown D.C., and burned it on camera. Arrests have been made, and the national leader of "The Proud Boys" has been charged after admitting his crime with pride.

94. On Sunday December 13, 2020, the Rev. Dr. Ianther Mills, the senior minister of the congregation, issued a widely quoted statement that read, in relevant part:

> Since 1836, Asbury United Methodist Church has stood at the corner of 11&K Streets NW, Washington, DC. We are a resilient people who have trusted in God through slavery and the Underground Railroad, Jim Crow and the Civil Rights Movement, and now as we face an apparent rise in white supremacy. Last night demonstrators who were part of the MAGA gatherings tore down our Black Lives Matter sign and literally burned it in the street. The sign burning was captured on Twitter. It pained me especially to see our name, Asbury, in flames. For me it was reminiscent of cross burnings. Seeing this act on video made me both indignant and determined to fight the evil that has reared its ugly head. We had been so confident that no one would ever vandalize the church, but it has happened.

95. This action carried out by white activists associated with the ideology promoted by Defendant law firm and its responsible management official Thomas Farr occurred only days after Plaintiff's presentation filmed before the Asbury United Methodist Church was disseminated by Farr.

96. Meanwhile, Plaintiff had been ordered into immediate surgery to remove polyps but was unable to obtain pre-operative care from his primary-care physician due to Defendant's disturbances and interference, and the complications in the doctor's ability to administer medical care that were effected by Defendant's Ogletree Deakins Five; Plaintiff had another surgery not requiring pre-operative clearance performed on the date on which he was to have had the polyp surgery requiring weeks of recovery, February 3, 2021 – leaving his health in a continually fragile

state and justifying his request for injunctive relief in this Complaint under the Civil Rights Act of 1871.

97.  Stopping Defendant from continuing to harm Plaintiff is urgent; on February 22, 2021, a physician declared Plaintiff officially *handicapped* – after Plaintiff had been declared a portrait of health in 2015 ahead of his Oxford visitorship (well before Farr entered his life) – a Defendant-caused blow under which Plaintiff still staggers as of November 16, 2023. *See* Exhibit H (declaration of Dr. Adam Sasso, as attested to the D.C. Government just this week).

98.  Nor will Defendant voluntarily cease the harassment and stalking without judicial intervention. On December 4, 2020, Plaintiff had attempted to resolve the dispute Defendant law firm had sprung on him when The Ogletree Deakins Five presented a settlement adding themselves, but this one with actual consideration (which Defendant had refused to provide previously to cover Defendant's). Plaintiff's counsel wrote:

> As you are aware, our client in the above-captioned matter is plunged into a severe period of medical crisis, the outcome of which remains uncertain with the discovery last week of polyps with immediate referral to surgery. We are grateful that the case is stayed for four months per Judge Boyle's order yesterday, and that Professor Jones now can proceed through pre-operative care without interference in his patient-physician relationships in light of the Stay Order.

> Professor Jones remains as confident as ever in his legal position, given the facts of what his former employer did to him during and after his employment, the harms those actions have caused and will cause, and the law compelling courts to correct with remedies. Should Professor Jones pass, his estate stands in a fine position to pursue the claims vigorously and would re-double efforts internationally to bring attention and justice to North Carolina.

> However, given the closing of the year 2020 and the fact that our clients had reached agreement on nearly all terms in September after the illegal offer was withdrawn, and in light of our concerns about the propriety of including named defense attorneys in the settlement agreement, we would like to propose a responsible and reliable closure that we believe resolves the case in a form reflective of the Defendants' desires[.]

99.  Rather than engage in negotiation as Plaintiff's health suffered due to Defendant's weeks of harassment and abuse and Defendant's role in causing that decline had been plainly established, Defendant's Thomas Farr wrote more threats, averring hours later in a letter that Defendant intended to commit actions to punish Plaintiff.

100. To date, Plaintiff is unable to obtain the primary-care-physician pre-operative care because Defendant's misconduct has obstructed the physician-patient relationship. Plaintiff's physician retained his own attorney in November, and Plaintiff no longer enjoys a normal patient-physician relationship because Defendant, actuated by the malfeasance of The Ogletree Deakins Five over four months at the end of 2020, has illegally contaminated Plaintiff's relationship with the one primary-care physician Plaintiff had for thirteen straight years. Because of Defendant's relentless, willful, and determined conduct, equal protection of the D.C. statutes to preserve the physician-patient relationship and to foster prompt medical care evades Plaintiff.

101. Moreover, the illegal conduct of Defendant cost Plaintiff approximately $358,000 in attorney services and fees to contend with and to contest the program of harassment conducted by or on behalf of Defendant after Plaintiff refused over August and September to enter into an illegally coerced agreement that sought to protect The Ogletree Deakins Five from Plaintiff's informing the public about Defendant's conduct and forcing Plaintiff to pay Defendant's lawyers $125,000 per attorney per instance of truth-telling.

102. To be sure, on the day before the February 3, 2021, surgery that Plaintiff did undergo, Plaintiff was faced with another bill for nearly $6,000 in attorney fees – all of which had arisen from services necessitated by the harassment and abuse carried out by Defendant in Washington, D.C., that Defendants undertook with full knowledge of Plaintiff's battle with Piriformis Syndrome in Summer 2020, his possible exposure to COVID-19 in late September 2020, and his

eventual need for emergency surgery to remove aggressive polyps found in November 2020 – and *long after* Plaintiff had moved to voluntarily dismiss his case against Defendant's client.

### COUNT ONE – DISRIMINATION IN VIOLATION OF 42 U.S.C. § 1985
(Conspiracy to Interfere with Civil Rights)

103. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

104. Mr. Jones is an African-American citizen of the United States, and thus is protected categorically under 42 U.S.C. § 1985.

105. Defendant Ogletree Deakins violated the civil rights and equal protection of the laws previously enjoyed by Mr. Jones by willfully interfering with his physician-patient relationship knowingly in spite of the civil laws protecting Plaintiff.

106. Defendant conspired to prevent, by force, intimidation and threats, the Plaintiff from exercising his rights and fulfilling his urgent medical needs.

107. In furtherance of their common goal of preventing Mr. Jones from actualizing medical care and enjoying a recovery, The Ogletree Deakins Five operated entirely as employees on behalf of Defendant and its interests.

108. The Defendant acted in concert to incite and then carry out a physically harmful program violating Mr. Jones's person.

109. Defendant promoted an assembly of persons to engage in tumultuous and violent conduct or the threat of it that created grave danger of harm to the Plaintiff and other similarly situated African-Americans, including the congregation of the Asbury United Methodist Church.

110. This conduct jointly undertaken to threaten the Plaintiff and others in order to disrupt civil rights activity in the nation's capital during the Election of 2020 was part of an ongoing course of

action pursued by the Defendant for the purpose of racially intimidating and preventing African-Americans – including Mr. Jones's largely African-American and female clientele – from exercising their civil rights.

111. The Ogletree Deakins Five's concerted destruction of Mr. Jones's health and drain on his finances was a direct, intended, and foreseeable result of the Defendant's unlawful conspiracy. It was instigated according to a common plan that The Ogletree Deakins Five pursued since being sanctioned by a judge in a federal court in September 2020, during the election held in November 2020, and in a climate in the neighborhood of Plaintiff and Plaintiff's physician's office culminating in an assembly denominated as the "Save America" rally held at the Ellipse in Washington, D.C. on January 6, 2021, during which a crowd of thousands was incited to descend upon the U.S. Capitol in order to prevent or delay through the use of force the counting of Electoral College votes.

112. As part of this unified program of intimidation, the Ogletree Deakins Five acted in concert to spearhead the assault on Plaintiff as soon as they learned in August and September of 2020 of his increasingly serious medical infirmity and his repeatedly sworn and proven need to focus on it. The carefully orchestrated series of events that unfolded in the offices of Plaintiff's primary-care physician and the assault on the physician and his staff were no accident or coincidence. It was the intended and foreseeable culmination of a carefully coordinated campaign to interfere with the legal rights of Plaintiff under D.C. Code § 22-1314.02 (the D.C. interference-with-access-to-a-medical facility act)[3], D.C. Code § 14-307 (the District of Columbia law prohibiting judges from

---

[3] D.C. Code § 22-1314.02 provides: (a) It shall be unlawful for a person, except as otherwise authorized by District or federal law, alone or in concert with others, to willfully or recklessly interfere with access to or from a medical facility or to willfully or recklessly disrupt the normal functioning of such facility by: […] (4) Telephoning the facility repeatedly to harass or threaten owners, agents, patients, and employees, or knowingly permitting any telephone under his or her

issuing a subpoena for medical records), and the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191 (HIPAA).

113. Defendant's actions were done in bad faith, with malice, and with willful disregard for Plaintiff's legal rights.

114. Defendant's actions directly and proximately caused, and continue to cause, Professor Jones to suffer financial, reputational, physical, and emotional harm.

115. Plaintiff remains unable to undergo the required polyp surgery due to the deleterious actions Defendant committed in violation of Section 1985, which provides, in relevant part:

**(2) OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR**

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

**(3) DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES**

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is

---

control to be so used for the purpose of threatening owners, agents, patients, and employees[.]" […] (d) Any person who violates subsections (a) or (b) of this section, upon conviction, shall be fined not more than the amount set forth in § 22-3571.01, imprisoned for not more than 180 days, or both."

lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

116. Accordingly, this Action seeks injunctive relief with the award of compensatory damages to redress the harm to the Plaintiff caused by the Defendants' use of intimidation, harassment and threats of violence to interfere with his legal rights and punitive damages to punish the Defendants for the reckless and malicious manner in which they acted and to enjoin and deter a recurrence of this unlawful conduct.

## COUNT TWO – FRAUD/FALSE PRETENSES

117. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

118. By refusing to disclose its corporate interests in entering into a non-disparagement agreement with Professor Jones, including by leaving out their $125,000 interests and any other mention of its Putative Defendant status in Initial Disclosures in their client's actions, Defendant, through its Ogletree Deakins Five, mined the Discovery and other investigative processes under way since 2017 to gain competitive intelligence against a formidable business competitor of theirs, Plaintiff, under the guise of representing a client, Plaintiff's former employer.

119. After they revealed themselves as interested parties (instead of disinterested parties) in August and September 2020 and were exposed by the confrontation with Plaintiff's counsel by letter of September 14, 2020, and then further exposed before the court in October 2020 (*see, e.g.,*

39

Exhibit E), Defendant then acted as though their client had never wanted to settle the case that should have been settled in August 2020; Defendant withdrew the settlement terms agreed upon by its client and Plaintiff.

120. Defendant had pretended that they were representing only named Defendants in the Campbell University action, and concealed until the settlement negotiations of August-September 2020 that Defendant itself seeking to enter into a settlement agreement with Plaintiff to benefit Defendant at Plaintiff's expense.

121. Defendant lured Plaintiff to Raleigh, N.C., in the height of the late-Spring pandemic season for a court-ordered Mediation Settlement Conference in Defendant's own office, where there were more of The Ogletree Deakins Five present than there were required Defendant-parties the judge had ordered to the Mediation Settlement Conference on June 19, 2020. Farr presided that day, and over those nine hours in Defendant office, none of Farr, Riggins, Calabro, Murphy, and Ng ever disclosed that they were seeking to be personal beneficiaries of any settlement.

122. Plaintiff, by contrast, operated in good faith, traveling and having two of his attorneys – one of whom flew in from New York City for three days – to attend with every intention of resolving the matter.

123. Defendant pretended to be working to close its clients' case with Plaintiff, while instead working its own aims, in violating Rules of Professional Conduct 5.6(b), 8.4(a), 8.4(c), and 8.4(g) as per E.D.N.C. Local Rule 83.1 and Fed. R. Civ. P. 11, as articulated in the Sept. 14, 2020, nine-page letter from Plaintiff's counsel to Defendant including approximately 50 pages of exhibits. Defendants' true aims were revealed only after Nov. 17, 2020, when Plaintiff's physician collapsed.

**COUNT THREE – TORTIOUS INTERFERENCE (SETTLEMENT CONTRACT)**

125. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

126. Through its dishonesty and its reckless disregard for law that includes rank violations of the above-identified rules of professional conduct, Defendant destroyed the settlement agreement between Plaintiff and Defendant's own client in order to carry out its own program of physical harm against Plaintiff: There was a contractual formation, the contract was of economic benefit to Plaintiff between Plaintiff and Defendant, Defendant knew of the contract, Defendant intentionally procured the breach of said contract, Defendant intended to cause both the destruction of the contract and the harm to Defendant caused by the destruction – and in its interference with said contract did what Defendant said it would do: protracted and compounded vexatious litigation for Defendant's own reasons that seriously harmed Plaintiff from September 2020 through at least July 2021 and into the present.

127. Defendant did so in violation of numerous Rules, as documented in Plaintiff's three attorneys' letter to Defendant on September 14, 2020:

> We are providing this letter under Rule 11(c)(2), Fed. R. Civ. P., as notice of the Plaintiff's intention to seek, and apply to the Court for the granting of, sanctions against the attorneys of Ogletree Deakins Nash Smoak & Stewart P.C ("**Ogletree Deakins**") "who have made an appearance in *Jones v. Campbell University, Inc.*, et al, No. 5:20-CV00029-BO (E.D.N.C.)" as Defendants' legal counsel (such attorneys, collectively, the "**Ogletree Putative Parties**") if, within twenty-one (21) calendar days of the date of this letter, the Ogletree Putative Parties do not remove themselves as acknowledged parties to the "non-disparagement" clause of the settlement agreement. Ogletree Deakins's failure to disclose to the Court its being a party to this dispute falls in violation of Fed. R. Civ. P. 11(a)-(b), subjecting the Ogletree Putative Parties to Rule 11(c) sanctions.

> ### I.   Applicable Law

> In order to encourage litigants to act in good faith, the Federal Rules of Civil Procedure specifically require parties to affirmatively disclose all relevant information without the necessity of court orders compelling disclosure; and these rules are designed to ensure that the ultimate resolution of disputed issues is based on a full and accurate understanding of the facts. *United States v. The Procter &*

*Gamble Company*, 356 U.S. 677, 682 (1958); *Hickman v. Taylor*, 329 U.S. 495, 500-01 (1947).

Under E.D.N.C. Local Rule 83.1 ("Attorneys"), all attorneys who have appeared in an action are bound by "(i) Professional Standards." The rule provides: "The ethical standard governing the practice of law in this court is the Revised Rule of Professional Conduct, now in force an as hereafter modified by the Supreme Court of North Carolina, except as may be otherwise provided by specific rule of this court." We write this safe-harbor letter to allow you and your Ogletree Deakins co-counsel to correct course under Fed. R. C. P. 11 within twenty-one (21) calendar days.

## II.   The Misconduct Requiring Correction or Sanction

Through the letter dated August 27, 2020, that you sent to Jeremy Adams, Esq., legal counsel to Plaintiff (attached hereto as **Exhibit A**, "**Ogletree August 27 Letter**"), you informed Plaintiff that a release and settlement agreement then-being negotiated and intended by Plaintiff and the named Defendants to resolve the issues in the above-captioned case would contain a "non-disparagement clause," the scope of which would cover not only the Defendants but also "all attorneys employed by Ogletree Deakins who entered notices of appearance in this case." Until the Ogletree August 27 Letter, none of the Court, Plaintiff and Plaintiff's legal counsel were ever informed that Ogletree Deakins would make its own attorneys, the Ogletree Putative Parties, joint parties to a settlement agreement by pursuing non-disparagement protections for those attorneys in a settlement agreement with Professor Jones, which non-disparagement protections contain huge cash remedies potentially due from Plaintiff to the Ogletree Putative Parties, subject to adjudication exclusively in state court in Raleigh, North Carolina. Never, for example, during the course of the nearly nine-hour Mediation Settlement Conference on June 19, 2020, in Raleigh did you or the other two of the four Ogletree Putative Parties indicate that you were to be parties to a settlement agreement intended to resolve the dispute between Plaintiff and Defendants. [FN3: In another surprise, and factually dishonest, proposed settlement term in your most recent communication, you proffer a term by which Professor Jones would agree that your most-recent draft agreement reflects what Campbell Defendants counteroffered on June 19. Term 21(a) on page 5 of Mr. Farr's September 11, 2020, F.R.E. 408 letter, discussed *infra*, provides: "(a) The parties agree that the form of this offer is identical to a term sheet that would have been prepared by the mediator and signed by the parties to confirm a full and complete settlement of all disputes between Mr. Jones, Campbell, and all the defendants and their agents, if the parties had settled their disputes at mediation. Therefore, written acceptance of this proposal by Mr. Jones will effect a full and complete settlement of all disputes, known and unknown, between Mr. Jones and the other parties to this Agreement." Never until lately were we informed that Ogletree attorneys were to appear as putative parties in a final agreement between Plaintiff and Defendants.]

On August 31, 2020, Mr. Adams sent you a letter, responsive to the Ogletree August 27 Letter, requesting that, among other changes to a small number of the settlement-agreement terms, Ogletree Deakins eliminate the Ogletree Putative Parties from the scope of the non-disparagement clause (including liquidated damages). However, in your written response, dated September 1, 2020, you reaffirmed that the scope of the

"non-disparagement clause" would apply to the Ogletree Putative Parties, declaring: "***Campbell will not delete references to Ogletree…***" (emphases added). In a nutshell, then, on September 1, Campbell Defendants purportedly rejected Plaintiff's written request to remove the Ogletree Putative Parties from the settlement agreement just as Plaintiff and Defendants were about to stipulate to a stay of the proceedings in the Court and actually settle the case, after 44 months of controversy between Plaintiff and Defendants. It remains hard for Plaintiff to believe that it was or remains in the interest of the named Campbell Defendants to put a settlement of a 44-month-old, material legal proceeding at-risk for a term in a settlement agreement that only benefits a set of collateral parties, the Ogletree Putative Parties. Hence, Plaintiff's conclusion is that the Ogletree Putative Parties have been parties to this legal proceeding all along.

In fact, in your letter dated September 9, 2020 (the "**Ogletree Non-Disparagement Letter**" (such letter attached hereto as **Exhibit B**)), which was in response to our request dated September 8, 2020, and sent by Mr. Adams (such request attached hereto as **Exhibit C**) for the language you proposed to include in a "non-disparagement clause," you continued to insist that the Ogletree Putative Parties be included in the scope of the "non-disparagement clause," and you provided the language set forth below (the "**Ogletree Non-Disparagement Clause**").

"JONES agrees that as of the effective date of this Agreement, he will not hereafter say, write, publish or do anything to disparage or discredit UNIVERSITY or any of the other RELEASED PARTIES or their services, members of the board of trustees, officers, deans, professors, employees, agents (including their lawyers). This includes doing or saying anything (e.g. including but not limited to postings or publications on the internet, newspaper articles or editorial, television or radio appearances, articles or books, or through social media avenues) that a reasonable person would expect at the time would have the effect of diminishing or constraining the goodwill and good reputation of the UNIVERSITY, any of the other RELEASED PARTIES, and any other persons covered by this paragraph. This obligation includes refraining from negative statements about UNIVERSITY, any of the other RELEASED PARTIES or any of the other persons covered by this paragraph, and their moral character, methods of doing business and the quality of their services, products, or personnel."

In Ogletree Non-Disparagement Letter, you further clarified the Ogletree Non-Disparagement Clause by furnishing the definition of "Released Parties" which is set forth below in relation to the Ogletree Non-Disparagement Clause.

The term "Released Parties" includes all of the current defendants and Dean Leonard and Professor Thrower. Campbell is also a "Released Party" and it is defined to include all of its officers, Deans, Associate Deans, Professors, members of the board of trustees, employees and all agents including its lawyers.

Furthermore, you were unequivocal in your insistence on the specific language of the "non-disparagement clause" above. To be precise, you stated, "***Campbell will not agree to any deviation from this provision***." (Emphases added.) And, again, you thus provided further support for Plaintiff's conclusion that the Ogletree Putative Parties have been parties to this legal proceeding all along. You then gave Plaintiff

> one business day to "take it or leave it" as to the total settlement agreement proposed
> on behalf of your clients.

[All emphases in original.] The above excerpt was followed by a litany of professional-ethics rules

Defendant broke in its quest to harm Plaintiff.

128.      In response to this invitation by Plaintiff – through his three counsel to Farr, Calabro,

Riggins, and Murphy – for Defendant to correct the settlement so that the actual parties could

settle, Defendant, led by Farr the very next day, issued a written threat (also in violation of the

Rules of Professional Conduct) and withdrew the settlement agreement entirely. And then

Defendant began filing innumerable papers in court, was sanctioned on September 22 for its June

misconduct, and proceeded its program to harm Plaintiff's health by harassing, intimidating, and

abusing Plaintiff's primary-care physician such that Plaintiff's health has deteriorated into the

present, without medical care and with a drain on financial resources while surgery remains on

hold.

### COUNT FOUR: TORTIOUS INTERFERENCE (PHYSICIAN-PATIENT CONTRACT)

129.      Through its dishonesty and its reckless disregard for law that includes rank violations of

the above-identified laws of the District of Columbia and Federal Government, Defendant has all

but destroyed the doctor-patient contract between Plaintiff and Dr. Schapiro in order to carry out

Defendant's own program of physical harm against Plaintiff to advance Defendant's legal interests

within its discrimination-defense law practice. There was a contractual formation, the contract was

of benefit to Plaintiff between Plaintiff and his longtime primary-care doctor known to Defendant,

Defendant knew of the contract, Defendant intended to cause both the destruction of the contract

and the harm to Defendant caused by the destruction – and in its interference with said contract

did what Defendant said it would do: protracted and compounded vexatious litigation for

Defendant's own reasons that seriously harmed Plaintiff from September 2020 through at least July 2021 and into the present.

130.    Defendant's tortious interference with Plaintiff's physician-patient relationship was thus intentional and without legal justification, and the tortious interference continues to this day, with effects on both the economic gain and on the health and welfare of Plaintiff in furtherance of the personal interests of The Ogletree Deakins Five confessed expressly by Defendant's Farr over August and September 2020.

## COUNT FIVE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

131. Plaintiff hereby incorporates as though restated each and every one of the enumerated allegations above.

132.    Defendant is an international management-side employment law firm.

133.    Defendant at all times was well aware of the medical conditions suffered by Plaintiff.

134.    Defendant sought at every turn, purposely, to harm Plaintiff's emotional well-being, engaging in a long-running program of harassment, interference with his physician, and illegal abrogation of resolution of a four-year-old employment dispute over illegal employment discrimination that itself has deprived Plaintiff of his rights.

135.    Defendant has a history of abusing African-Americans and then lying about it that is so disastrous that its principal in this case, Thomas Farr, failed to be confirmed to the federal judiciary.

136.    In the stressful 2020 year of the COVID-19 pandemic and the destruction of Washington, D.C., by throngs of protests over much of the year, Defendant willfully piled on to Plaintiff in order to harm him to remove him from challenging the discrimination Defendant is in business to

conceal and/or to promote. Plaintiff in February 2021  was deemed physically handicapped for the first time in his life.

137.    The actions of Defendant carried out by The Ogletree Deakins Five have left Professor Jones indefinitely with medical disabilities that are now entirely to the misconduct of Defendant.

## COUNT SIX: BIAS-RELATED CONSPIRACY, THEFT, CONVERSION OF PRIVATE PROPERTY,  AND EXTORTION IN VIOLATION OF D.C. CODE § 22-3701 ET SEQ.

137. Plaintiff restates and realleges all other paragraphs of this Complaint, which are incorporated by reference as is set forth fully herein.

138. This claim arises under the D.C. Bias-Related Crime Act of 1989, D.C. Code §§ 22-3701(1)-(2) and 22–3704, which provides victims of crimes demonstrating bias with a private right to action, irrespective of any criminal prosecution for those acts.

(3) To establish a bias-related offense under D.C. Code § 22-3701 et seq., the perpetrator must have committed the underlying crime because of the perpetrator's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibility, homelessness, disability, matriculation, or political affiliation of the victim.

139. Defendant entered into an agreement to participate in unlawful acts in the District of Columbia in furtherance of their goals of targeting Amos Jones and his national civil-rights practice through use of violence.  Some of the known unlawful acts consequent to the conspiracy include extortion, conversion of property, theft of property, and assault.

140. Plaintiff incurred injuries due to Defendant's intentional actions in furtherance of this conspiracy, including from theft and destruction of Plaintiff's property, obstruction of Plaintiff's

in-progress medical care landing Plaintiff in the hospital for twelve hours at George Washington University in March 2021, and the aftermath of those events.

141. The Defendant's actions—which targeted the Plaintiff and his medical providers, such as Dr. Horacio Schapiro—were motivated by bias arising from actual or perceived race, color, and/or political affiliation. Plaintiff's injuries resulted from the Defendant's prejudice.

142. As discussed above, the Defendant targeted the Plaintiff for racially discriminatory reasons— because Plaintiff represents Black people.

143. These actions violate several sections of the criminal code of the District of Columbia that constitute predicate offenses under the D.C. Bias-Related Crime Act, including D.C. Code § 22-1805a (which prohibits conspiracies), D.C. Code § 22-3211 (which prohibits theft), D.C. Code § 22-3221 (which prohibits fraud), and D.C. Code § 22-3251 (which prohibits extortion).

144. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and is entitled to compensatory, consequential, and punitive damages, in an amount to be determined by the Court. In addition, because Defendant is a continued threat to Plaintiff, Defendant is entitled to injunctive relief.

<u>**REQUESTED RELIEF**</u>

WHEREFORE, Plaintiff prays this Court for the following relief:

145.   Enter a judgment in Plaintiff's favor and against Defendant declaring that Defendant violated Sections 2 and 3 of the Civil Rights Act of 1871 as amended, 42 U.S.C. § 1985;

146.   Enter a judgment in Plaintiff's favor and against Defendant declaring that Defendant violated the D.C. Bias-Related Crime Act, D.C. Code § 22-3701 et seq, including § 22-3704;

147.   Enter a judgment in Plaintiff's favor and against Defendant for Defendant's fraud/false pretenses, tortious interference with prospective economic gain (in destroying Plaintiff's

settlement agreement with Defendant's client Campbell University), tortious interference with contract (between Plaintiff and Dr. Horacio Schapiro's medical practice), and intentional infliction of emotional distress;

148.   Award Plaintiff injunctive relief by ordering Defendant to never again communicate with Plaintiff and Plaintiff's physicians plus compensation for the costs and fees incurred for services caused by the caption-delineated civil wrongs that animated Defendant's civil-rights conspiracy against Plaintiff;

138.   Award Plaintiff damages in an amount to be proven at trial for economic losses, pain and suffering/emotional distress, and loss of enjoyment of life that he has experienced as a result of Defendant's unlawful conduct;

139.   Award Plaintiff punitive damages in an amount to be proven at trial;

140.   Award Plaintiff reasonable attorneys' fees, as well as pre-judgment and post-judgment interest, litigation expenses, and costs; and

141.   Grant such other and further relief which the Court may deem appropriate.

## JURY DEMAND

Plaintiff requests a jury trial for all the counts in this case.

Respectfully submitted, I declare under penalty of perjury that the foregoing is true and correct,

/s/ Amos N. Jones                    11/16/23

/s/ Amos N. Jones                    Date
*Pro se*
1150 K ST NW
Washington, DC  20005-6809
jones@amosjoneslawfirm.com
Telephone: (202) 351-6187, Extension 4
Facsimile: (202) 478-1654
*not admitted in the D.D.C. federal court (D.C Bar No. 974919)*

Date: Thursday, November 16, 2023